**STATE OF HAWAII**, Plaintiff–Appellee, v. **MILES YAMASHIRO**, Defendant–Appellant

NO. 14447

(CR. NO. 88–0913)

AUGUST 14, 1991

BURNS, C.J., HEEN, J., AND CIRCUIT
JUDGE CRANDALL, ASSIGNED BY
REASON OF VACANCY

**596**

OPINION OF THE COURT BY HEEN, J.

We affirm Defendant–Appellant Miles Yamashiro's (Defendant) conviction after a second jury trial of the offense of Assault in the First Degree. Hawaii Revised Statutes (HRS) § 707–710(1) (1985).[1]    Defendant was charged with the offense after he

---

[1] Hawaii Revised Statutes (HRS) § 707–710(1) (1985) reads as follows:

**Assault in the first degree.** (1) A person commits the offense of assault in the first degree if he intentionally or knowingly causes serious bodily injury to another person.

allegedly struck one Stephen DeSautel (victim) in the face with a golf club. Defendant's first trial ended in a mistrial on September 29, 1989, when the jury could not agree on a verdict.

## I.

Defendant first argues that the trial court erred in denying his motion for judgment of acquittal at the end of the case.[2] The motion was based, *inter alia*, on the ground that the evidence was not sufficient to prove that the victim suffered "serious bodily injury" as defined in HRS § 707–700 (Supp. 1990).[3] The argument is without merit.[4]

## A.

In reviewing the lower court's denial of a motion for judgment of acquittal, the appellate court must view the evidence in the light most favorable to the state and determine whether, giving full play to the factfinder's right to weigh the evidence, determine credibility, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. *State v. Emmsley*, 3 Haw. App. 459, 652 P.2d 1148 (1982). We examine, first, the injuries suffered by the victim as shown by the evidence.

---

[2] Defendant also assigns as error the denial of his motion for judgment of acquittal at the end of the State's case. However, when he proceeded to present evidence in his defense, he waived any error that may have occurred prior to that time. *State v. Rodrigues*, 6 Haw. App. 580, 733 P.2d 1222 (1987).

[3] See Part I. C., below, for a discussion of HRS § 707–700 (Supp. 1990).

[4] Defendant also asserts that the trial court abused its discretion in allowing into evidence photographs of the injuries suffered by the victim of the assault. We find no abuse of discretion. *State v. Ahlo*, 2 Haw. App. 462, 634 P.2d 421 (1981), *cert. denied*, 456 U.S. 981, 102 S. Ct. 2252, 72 L. Ed. 2d 858 (1982).

### B.

Doctors Katsuji Kubo (Dr. Kubo), a plastic and reconstructive surgeon, and Lonnie Tiner (Dr. Tiner), an oral and maxilla[5] surgeon, treated the victim's injuries on August 8, 1987. Both doctors testified at Defendant's first trial and, pursuant to the parties' stipulation, the transcript of their testimony was read to the jury at Defendant's retrial and received in evidence.

Dr. Kubo treated the victim for "extensive facial injuries." He performed extensive reconstructive surgery on the victim's cheekbone and the bones supporting the bottom of the eye socket in order to repair two fractures to the left cheekbone and one to the right. Dr. Kubo expressed the opinion that, if the corrective surgery had not been performed, the victim would have suffered permanent disfigurement to his face; the left side of the victim's face would have been depressed or flattened, and his left eye would have had a sunken appearance. Dr. Kubo stated that the surgery helped to retard this disfigurement. Additionally, Dr. Kubo was of the opinion that, if the victim had not had medical treatment, he would have suffered prolonged or protracted impairment of his eyesight, difficulty in chewing, and loss of sensation on the left side of his face.

Dr. Tiner treated the injuries to the victim's lower jaw. On first examining the victim, Dr. Tiner observed a number of teeth which were loose, broken, or displaced, and noted that crowns were missing from several teeth. He also observed multiple fractures in several areas of the lower jawbone.

Dr. Tiner put the displaced teeth back into place, anchoring them with wires, stitched up some displaced gum tissue, and repaired a lip laceration. He testified that at the time he treated the

---

[5] The maxilla is the upper jaw. *Webster's Third New International Dictionary of the English Language Unabridged* 1395 (1981).

victim he expected that the wires would limit the victim's ability to open his mouth and that the victim would not be able to eat normal food. He also testified that the wires had to be replaced later by another oral surgeon after they had come loose.

Dr. Tiner testified that he reexamined the victim on September 18, 1989, one week prior to the first trial. He noted then that some teeth were still broken and some crowns were still missing. In addition, the bone overlying the lower eyetooth on the right side was "gone," exposing a root which was decaying. Dr. Tiner testified that this decay problem was caused by the fractured jawbone and the resulting exposure of the root. Additionally, the examination showed that some infection had occurred after the surgery; however, that could have been cleared up if it had been treated earlier. Dr. Tiner testified that the victim will require more tooth extractions, possible root canal work, and implants of "nonremovable [false] teeth" or bridge work.

Dr. Tiner stated that the loss of teeth was a "disfigurement" and a serious problem. In addition, Dr. Tiner testified that there was permanent damage to the victim's jaw joint; the victim had pain and a clicking sound in the right jaw joint which did not exist prior to the injury.

The victim took the witness stand and showed the jury the scars from his facial injuries and the damage to his lip and lower jaw. The trial court admitted in evidence, over Defendant's objection, a photograph of the victim taken prior to the incident, to enable the jury to determine the extent of any disfigurement.[6] The victim testified that the sense of feeling has never returned to the left side of his face, from the left part of his left eye, through the left cheek, down the left side of his nose, and inside his mouth. He testified that his face and vision are "lopsided," the left side of his

---

[6] Defendant does not argue on appeal that the court erred in admitting this photograph into evidence.

face feels tighter, and there is a lump of scar tissue on his lip. In addition, he stated that when he blinks or smiles he can feel that some bone is missing, and he is sometimes bothered by the wires in his cheekbone, near his eye socket. The victim testified that, as a result of the numbness of his face and lip, he cannot tell if his nose is running until the mucous enters his mouth. He testified that he will need further dental work, including the extraction of seven or eight teeth, because of the incident. Although he can chew, he is unable to eat hard foods, such as apples, because his teeth are loose.

Defendant contends that the victim's scars were minimal and the loss of teeth was not a disfigurement, since the teeth were not visible. He also argues that, since the victim's teeth were to be replaced by bridgework, and the evidence otherwise showed only numbness, minor discomfort, "clicking of the jaw joint," and loose and lost teeth, the latter resulting from an infection that later set in, the victim did not suffer permanent loss or protracted impairment of a bodily member or organ. Consequently, he asserts that the trial court should have granted his motion for acquittal. The following discussion of the law regarding serious bodily injury reveals Defendant's argument is without merit.

## C.

Serious bodily injury is defined in HRS § 707–700, *supra*, as:

bodily injury which . . . causes serious, permanent disfig-
urement, or protracted loss or impairment of the function
of any bodily member or organ.

Our statutes do not define "serious, permanent disfigurement, or protracted loss or impairment." Neither do they define "member" or "organ."[7] The question is whether the victim's injuries

---

[7] *Webster's Third New International Dictionary of the English Language Unabridged* (1981) defines the latter two terms as follows:

described above meet the definition of HRS § 707–700. Other jurisdictions have been faced with the question whether the loss of teeth and broken facial and jaw bones are serious (or grave) injuries within the meaning of their assault statutes. Although their statutes are not identical to ours, they are sufficiently similar, in our view, so that we may look to those jurisdictions for guidance.

In *Walker v. State*, 742 P.2d 790 (Alaska Ct. App. 1987), it was held that evidence of a broken jaw, which had to be wired shut for six weeks, established sufficient protracted impairment of the function of a body member or organ [8] to allow a jury to find beyond a reasonable doubt that the defendant's actions constituted first–degree assault. [9] The Minnesota Court of Appeals, in *State v.*

---

member: . . . 1a: bodily part or organ . . . ; *specif:* a part (as a limb) that projects from the main mass of the body[,]

*id.* at 1408; and

organ: . . . 2a: a differentiated structure (as a heart, kidney, leaf, or stem) in an animal or plant made up of various cells and tissues and adapted for the performance of some specific function and grouped with other structures sharing a common function into systems; . . . b: bodily parts performing a function or cooperating in an activity <the eyes and related structures that make up the visual~>[.]

*Id.* at 1589.

[8] The Alaska court noted that the Alaska statute did not define "protracted impairment of a body member or organ" and looked to the dictionary for the meaning of those terms.

"Protracted" is defined as "to draw out or lengthen in time or space." *Webster's Third New International Dictionary of the English Language Unabridged,* 1826 (1963). "Member" means, "a bodily part or organ." *Id.* at 1408. "Part," in turn, is defined as, "a portion of a plant or animal body . . . ." *Id.* at 1645.

*Walker v. State,* 742 P.2d 790, 791 (Alaska Ct. App. 1987) (emphasis in original).

[9] "Serious physical injury" was defined in the Alaska statute as:

(B) physical injury that causes serious and protracted disfigurement, protracted impairment of health, protracted loss or impairment of the function of a body member or organ, or that unlawfully terminates a pregnancy.

*Id.* at 790.

*Bridgeforth*, 357 N.W.2d 393 (Minn. Ct. App. 1984), held that, under its first degree assault statute, the loss of a tooth is a permanent loss of the function of a bodily member.[10] *Accord Pitts v. State*, 742 S.W.2d 420 (Tex. Crim. App. 1987), and *Lenzy v. State*, 689 S.W.2d 305 (Tex. Crim. App. 1985).[11]

### D.

The evidence and justifiable inferences, considered in the most favorable light for the State, were clearly sufficient to enable a reasonable mind to fairly conclude beyond a reasonable doubt that the injuries suffered by the victim constituted "protracted loss or impairment of the function of [a] bodily member or organ" and/or serious permanent disfigurement to his face under HRS § 707–700.

### II.
### A.

The trial court instructed the jury on the elements of the charged offense of Assault in the First Degree and, at Defendant's request, further instructed the jury as follows:

---

[10]. The Minnesota statute imposed criminal liability for the infliction of "great bodily harm," which was statutorily defined as:

> bodily injury which . . . causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm.

*State v. Bridgeforth*, 357 N.W.2d 393, 394 (Minn. Ct. App. 1984).

[11] Aggravated assault was defined by the Texas statute as:

> (a) A person commits an offense if that person commits assault as defined in Section 22.01 of this code and the person:

> (1) causes serious bodily injury to another, including the person's spouse[.]

*Pitts v. State*, 742 S.W.2d 420, 421 (Tex. Crim. App. 1987). Texas' definition of "serious bodily injury" is similar to the Hawaii statute.

If you are not satisfied beyond a reasonable doubt that the Defendant is guilty of the charged offense Assault in the First Degree, you may consider whether or not he is guilty of a lesser–included offense.

A lesser included offense in this case is Assault in the Second Degree.

A person commits the offense of Assault in the Second Degree if he intentionally or knowingly causes substantial bodily injury to another person, or recklessly causes serious bodily injury to another person.

You are instructed that if and only if you find defendant not guilty of Assault in the First Degree, you may consider whether or not the defendant is guilty of Assault in the Second Degree. However, before you can find the defendant guilty of Assault in the Second Degree, the prosecution must prove each and every material element of this offense beyond a reasonable doubt.

Although the above instruction was given at his request, Defendant, relying on *State v. Ferreira*, 8 Haw. App. 1, 791 P.2d 407 (1990), now asserts it was plain error for the trial court to give the last paragraph.[12] Hereafter, the last paragraph of the above

---

[12] The lesser included offense instruction was in accord with HRS § 701–109(4) (1985), which reads as follows:

**Method of prosecution when conduct establishes an element of more than one offense.** * * *

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:

    (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

    (b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

    (c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or pub-

instruction will be referred to as the Instruction.[13]

Defendant's reliance on *State v. Ferreira, supra*, is misplaced. First, in *Ferreira*, the instruction, similar to the one challenged here, was given over the defendant's objection;[14] in this case, Defendant requested the Instruction. Second, the basis for our decision in *Ferreira* was that the instruction was inconsistent with this state's statutory and judicial policy against a trial ending in a hung jury. *Id. Ferreira* did not hold that the instruction was an incorrect statement of the law or that it was prejudicial to the defendant in that case.

---

lic interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

[13] In the answering brief, the State conceded that the Instruction was improper. However, at oral argument the State indicated that, although it still maintains, as it did in *State v. Ferreira*, 8 Haw. App. 1, 791 P.2d 407 (1990), that the Instruction was correct, the State could not adhere to that position in the answering brief, since this court had rejected the argument in *Ferreira*, and the supreme court had denied the State's petition for *certiorari* in that case. The State further contends that the court below did not commit plain error in giving the Instruction.

[14] The instruction in *State v. Ferreira*, 8 Haw. App. 1, 791 P.2d 407 (1990), reads as follows:

If you unanimously agree that [Ferreira] is not guilty of [First Degree], then and only then may you consider whether he is guilty or not guilty of the included offense of [Second Degree].

*Id.* at 3, 791 P.2d at 408. Such instructions have been labeled as "acquittal first" instructions. *See* Recent Decisions, *State v. Wussler: An Unfortunate Change In Arizona's Lesser–Included Offense Jury Instruction*, 27 Ariz. L. Rev. 515 (1985) (hereafter 27 Ariz. L. Rev.).

The defendant in *Ferreira* had requested the court to submit the following instruction to the jury:

If you cannot unanimously agree on a verdict on the charge of [First Degree] then you may consider whether BARRY J. FERREIRA committed the offense of [Second Degree].

*State v. Ferreira*, 8 Haw. App. at 3, 791 P.2d at 408. Such instructions are referred to as "disagreement" instructions. *See* 27 Ariz. L. Rev., *supra*.

We find it necessary to note, here, that the complete instruction given by the court in this case is anomalous in that it instructs the jury that the jury may use two procedures in moving from its consideration of the charged offense to the lesser included offense. In the first paragraph, the above quoted instruction informs the jury that it may consider the lesser included offense if it is not satisfied beyond a reasonable doubt that Defendant was guilty of the charged offense.[15] The Instruction, on the other hand, instructs the jury that it may consider the lesser included offense only if it first finds Defendant not guilty of the charged offense. The Instruction was an "acquittal first" instruction.[16] In the posture of this case, we do not find the anomaly prejudicial to Yamashiro. We turn now to the question whether the instruction was plain error.

### B.

Rule 30(e), Hawaii Rules of Penal Procedure (HRPP) (1977), provides that the giving or refusing to give an instruction may not be assigned as error unless objected to before the jury retires to consider its verdict.[17] To the same effect is HRS § 641–16

---

[15] Such an instruction has been called the "reasonable doubt" instruction, since it permits the jury to consider the lesser included offense if it is not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged. One commentator has noted that this instruction implies to the jury that they must reach a unanimous decision on the greater offense before considering the lesser one. *See* 27 Ariz. L. Rev. at 518 n.21.

[16] *See supra* note 13.

[17] Rule 30(e), Hawaii Rules of Penal Procedure (HRPP) (1977), reads in pertinent part as follows:

> **Instructions and Objections.** . . . No party may assign as error the giving or the refusal to give, or the modification of, an instruction, whether settled pursuant to subdivision (b) or subdivision (c), of this rule, unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

(1985).[18] However, we may notice "plain error" where an appellant's substantial rights are affected. Rule 52(b), HRPP (1977);[19] *State v. Fox*, 70 Haw. 46, 760 P.2d 670 (1988).

In *Fox*, the supreme court stated:

> We have not endeavored to place a gloss on the [plain error] rule, as other courts have, "by [further] defining the kind of error for which [we would] reverse under Rule 52(b)." In our view, the decision to take notice of plain error must turn on the facts of the particular case to correct errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings."

*Id.* at 56, 760 P.2d at 676 (citations omitted). The supreme court also stated that the "power to deal with error is one to be exercised sparingly and with caution[.]" *Id.* at 57, 760 P.2d at 676. Generally, a party to litigation must look to his attorney for protection and bear the costs of his attorney's mistakes. *Id.* at 55, 760 P.2d at 675.

Other jurisdictions have held that use of an acquittal first instruction is not wrong as a matter of law, *United*

---

[18] HRS § 641–16 (1985) reads in pertinent part as follows:

**Judgment; no reversal when.**

\* \* \*

No order, judgment, or sentence shall be reversed or modified unless the court is of the opinion that error was committed which injuriously affected the substantial rights of the appellant. . . . Except as otherwise provided by the rules of court, there shall be no reversal for any alleged error in the admission or rejection of evidence or the giving of or refusing to give an instruction to the jury unless such alleged error was made the subject of an objection noted at the time it was committed or brought to the attention of the court in another appropriate manner.

[19] Rule 52(b), HRPP (1977), reads as follows:

**Plain Error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

*States v. Tsanas*, 572 F.2d 340, 346–47 (2d Cir.), *cert. denied*, 435 U.S. 995, 98 S. Ct. 1647, 56 L. Ed. 2d 84 (1978) (no plain error affecting substantial rights), and does not constitute fundamental error. *State v. Wussler*, 139 Ariz. 428, 679 P.2d 74 (1984). It is the favored instruction in most states. Recent Decisions, *State v. Wussler: An Unfortunate Change In Arizona's Lesser–Included Offense Jury Instruction*, 27 Ariz. L. Rev. 515, 518 (1985) (hereafter 27 Ariz. L. Rev.).

The acquittal first instruction presents advantages and disadvantages to the defense and prosecution. *Tsanas, supra*; *Wussler, supra*. The disadvantage to a defendant is that the instruction could possibly have a coercive effect on the minority jurors who may be holding out for acquittal on the greater offense. The minority, being unable to convince the majority to acquit on the greater offense, may, nevertheless, believe that the defendant has committed some crime, but not necessarily the one charged. The acquittal first instruction could cause the minority to accede to the majority and convict the defendant on the greater charge in order not to let the defendant go free or cause a mistrial. *Tsanas, supra*; 27 Ariz. L. Rev., *supra*. In *Tsanas*, the court stated that, balancing the advantages and disadvantages of both the "acquittal first" and "disagreement" instructions, neither form of instruction is wrong as a matter of law. 572 F.2d. at 346.

Defendant argues that the Instruction affected his due process right to have the jury correctly instructed as to his theory of defense that the evidence of the victim's injuries did not support a conviction for Assault in the First Degree. He asserts that a new trial must be ordered, contending that under the Instruction: (1) the lesser included offense would never be considered by the jury if every juror is required to vote to acquit him on the greater offense, and (2) "it cannot be concluded beyond a reasonable doubt that one or more jurors did not, at any time during deliberations, entertain a

reasonable doubt as to the greater offense." We find no merit in Defendant's arguments.

Under any form of instruction, the jury would have been required to consider the evidence in relation to the greater charge first. Under the evidence and circumstances of this case, we do not believe it can reasonably be said that the verdict was compelled by the Instruction rather than by the evidence. Defendant argues that the fact that his first trial ended in a "hung" jury indicates the evidence was weak. Our view of the evidence is otherwise. Moreover, in our view, the fact that the jury could not agree in the first trial indicates the Instruction was not prejudicial.

Defendant's argument that one cannot conclude beyond a reasonable doubt that one or more jurors did not entertain a reasonable doubt as to his guilt of the greater offense may be intrinsically correct. However, that may be said of jury deliberations under any set of instructions and facts. How the jury may have been split in the course of their deliberations is meaningless.

We hold that, under the circumstances of this case, the Instruction was not prejudicial to Defendant's substantial rights.

### III.

In view of our disposition of Defendant's plain error argument, we reject his argument that his trial counsel was ineffective for requesting the Instruction rather than a disagreement instruction. In view of the earlier confusion in this area, which we noted in *State v. Ferreira*, 8 Haw. App. at 5, 791 P.2d at 409, counsel's actions did not indicate a "lack 'of skill, judgment or diligence' that resulted in the 'withdrawal or substantial impairment of a potentially meritorious defense.' " *State v. Dunn*, 8 Haw. App. 238, 248, 798 P.2d 908, 913 (1990) (quoting *State v. Antone*, 62 Haw. 346, 348–49, 615 P.2d 101, 104 (1980)).

Affirmed.

*Richard S. Kawana* (*Susan Barr* on the brief) for defendant–appellant.

*Charlotte J. Duarte*, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff–appellee.